UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
MARGUERITE ANDERSON,

                              Plaintiff,

       -against-

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

------------------------------------------------------------ x

MEMORANDUM & ORDER

1:12-CV-04094 (ENV)

VITALIANO, D.J.

      Plaintiff Marguerite Anderson brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her Supplemental Security Income ("SSI") benefits. The parties have filed cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, the Commissioner's motion is granted and Anderson's motion is denied.

## Background

### A. Procedural History

      Anderson filed applications for disability benefits on October 24, 2008 and November 3, 2008, claiming that her back problems and high blood pressure had rendered her disabled, with a disability onset date of August 31, 2006. (Tr. 59-62.) Her applications were denied by the Social Security Administration ("SSA") in the

1

first instance, on February 6, 2009, (Tr. 65-72), and upon reconsideration on April 3, 2009. (Tr. 74-82.) Anderson then requested a hearing before an Administrative Law Judge ("ALJ"), (Tr. 83-84), which took place on April 20, 2011. (Tr. 29.) The ALJ issued his opinion on August 11, 2011, finding that Anderson was not disabled within the meaning of the Social Security Act ("the Act"). (Tr. 8-22.) Anderson filed a request for review, which the Appeals Council denied on July 23, 2012.[1] (Tr. 1-5.) This timely action followed.

B. Medical Record and Work Experience

Anderson was 49 years old at the alleged onset of her disability in 2006, and 54 years old at the time of the ALJ's decision. She has a high school education. From 1988 to 2006, Anderson worked as a security officer, and, from 2003 to 2007, she worked as a self-employed babysitter. (Tr. 120-21.) Even after the date of the alleged onset of her disability, Anderson continued to work as a security officer, and as a self-employed babysitter. (Tr. 37-38, 116-19, 134, 139, 152.)

On November 21, 2009, plaintiff reported in a SSA questionnaire that she experienced lower back pain which "at times radiated down her hips and legs." (Tr. 171.) She took ibuprofen during the day and cyclobenzaprine, a muscle relaxant, at night to relieve the pain. (*Id.*) She also used a "hot pad" for her back. She performed daily household chores, such as cooking meals, washing dishes, doing laundry, and shopping for groceries. However, she says, she could not bend down to scrub low

---

[1] The ALJ's decision is the final order of the Commissioner.

surfaces, could not pick up heavy loads of laundry, and, when she shopped, brought her 20-year-old son to carry the bags and to reach for items on high shelves. (Tr. 172.) On a typical day, Anderson testified, she would wake up, shower, make coffee, get dressed, and then sit down and do "nothing" for the remainder of the day. She claimed she could only sit for a half hour, or stand for 20 minutes, before feeling discomfort. At the 2011 hearing, Anderson testified that she had ceased taking ibuprofen and had been taking Hydrocodone for two weeks prior to the hearing. She also took Zocor for her high blood pressure. She testified that she had (then) recently visited the emergency room for her back and leg pain. Anderson brought a cane with her to the hearing, though it was not prescribed by a health care professional nor was it necessary to help her stand; she said she needed it for navigating long distances and uneven terrain. (Tr. 49, 54.)

  i.  Treating Sources

In her application for disability benefits, plaintiff identified only one treating physician, Dr. Sultana Rahman of the Brookdale Family Care Center in Brooklyn. (Tr. 135-37.) As far as the record shows, plaintiff saw Dr. Rahman only once, on March 6, 2008, when she conducted a physical of the plaintiff and diagnosed her with obesity, dyslipidemia, gastritis, ad hypertension. Dr. Rahman prescribed several medications, including Diovan for high blood pressure and Procardia for high cholesterol. (Tr. 136.) There is no indication that Dr. Rahman made any inquiry into or assessment of the disabilities Anderson ultimately claimed in her

benefits application, other than the diagnostic findings already listed, which, when made, do not reflect any findings of disability despite their being made after the disability onset date.

On January 23, 2009, after Anderson had applied for disability benefits, Dr. James Harvey conducted a consultative examination, that is, a "disability evaluation." (Tr. 206.) In that consultation, plaintiff described her history of hypertension and back pain that "radiated" to her thighs and caused pain when standing and walking. (*Id.*) She also asserted she had had "a MRI in the past which showed degenerative disk disease and state[d] that she was told that no further specific treatment would be helpful." (*Id.*) Upon examining plaintiff, Dr. Harvey concluded that she had "no demonstrable clinical reduction in function," and that her hypertension was controlled by her medication. (Tr. 208.) An X-ray of plaintiff's spine taken one week after Dr. Harvey's evaluation showed multi-level spondylosis (degenerative osteoarthiritis), but no other abnormalities. (Tr. 215.)

On February 5, 2009, Dr. Abraham Oyewo, a non-examining medical consultant, reviewed Anderson's medical record to determine her residual functional capacity. (Tr. 217-24.) He found that she could lift or carry up to 50 pounds on an infrequent basis and up to 25 pounds on a frequent basis, that she could sit, stand and walk for approximately six hours a day, and that she could push or pull without limit. (Tr. 218.) He found that plaintiff had no postural limitations, meaning she could climb, balance, stoop, kneel, crouch, or crawl frequently, nor did she have any visual, communicative, manipulative, or environmental limitations.

(Tr. 219-21.) Accordingly, Dr. Oyewo concluded that plaintiff's disability claims were not supported by medical evidence. (Tr. 222.) He also indicated that there was no treating physician statement on file describing plaintiff's physical capacities. (Tr. 223.)

Next, on October 6, 2009, Anderson was examined at the Wellstar Cobb Hospital Clinic ("Wellstar clinic"), where she complained of lower back pain. She was diagnosed there with hypertension, elevated lipids, obesity, and urinary tract infections. (Tr. 245; see Tr. 237-60.) A chest x-ray showed scarring and mild degenerative changes in the thoracic spine. (Tr. 14.) On November 17, 2009, plaintiff returned to the Wellstar clinic, this time complaining of an ear ache. The examining physician suggested she take over-the-counter aspirin. (*Id.*) Spinal x-rays taken on December 11, 2009 showed minimal scoliosis, minimal anterior spondylosis T9-T11, mild anterior spondylosis T12, minimal anterior spondylosis L4-L5, and no spondylolisthesis or subluxation. (Tr. 226.)

On December 17, 2009, Dr. Peter Giglio conducted a second consultative examination. (Tr. 227-36.) Again, plaintiff complained of hypertension and lower back pain that radiated to her legs. (Tr. 228.) Specifically, she complained of having difficulty standing, sitting, and walking, and claimed she could not bend over, lift any weight, reach, pull, grasp, recline, sit, stand, ambulate, climb stairs, or travel without difficulty. At the same time, however, she also stated she was able to do light housework, including cooking and making her bed. (Tr 14.) Dr. Giglio diagnosed Anderson with lumbar degenerative disc disease, hypertension, and obesity. (Tr.

5

231.)

Next, on January 19, 2010, plaintiff was seen at the Wellstar clinic, and complained of a "roaring in her right ear." (Tr. 15.) She was advised to exercise and limit carbohydrates in her diet.

Then, on March 4, 2010, Dr. Hector Manlapas, another non-examining medical consultant, evaluated Anderson's records to determine her residual functional capacity. (Tr. 261-68.) Like the consultative physicians before him, Dr. Manlapas concluded that, while Anderson was limited to occasional overhead reaching, she had no other manipulative, visual, communicative, or environmental limitations except for a moderate exposure to hazards. (Tr. 262, 267.) Like Dr. Oyewo, Dr. Manlapas concluded that plaintiff could balance, climb ramps and stairs, stoop, kneel, crouch, crawl, but that she could not climb ropes, ladders or scaffolds due to her back pain and obesity. He further found that plaintiff's hypertension was controlled by medication, and that she had no visual or communicative limitations, no manipulative limitations except for a limited overhead reaching capability, and no environmental limitations except for a moderate exposure to hazards. (Tr. 264-65.)

Although plaintiff's hearing before the ALJ occurred on April 20, 2011, she continued to submit medical evidence after that date. Specifically, on May 3, 2011, plaintiff reported that she had recently been admitted to the emergency room for bilateral thigh pain and non-palpable purpura (discolorations), which had "resolved." (Tr. 269.) Examination also showed that her lungs were clear and her

hypertension well controlled, (*id.*), and that there was no palpable mass in her thighs, which were "minimally tender to palpation." (Comm'r Br. 8; Tr. 269). The examining physician diagnosed Anderson with hypertension, hyperlipidemia, resolving non-palpable purpura, and asymptomatic gallstones. (Tr. 269.)

In addition, on February 28, 2012, plaintiff was given a neurology examination at the Brookdale University Hospital Clinic in Brooklyn, after she complained of numbness in her hands, "burning pain" in her thighs, and lower back pain. (Tr. 274-75.) The examining physician concluded that Anderson's sensation was normal except for the sensation in her thighs, where it was decreased. (Tr. 274.) Otherwise, the examiner found that plaintiff's coordination and reflexes were normal, and that she had a steady forward gait but an unsteady tandem walk. (*Id.*)

ii.  Vocational Expert Testimony

At the April 2011 hearing, a vocational expert, Dr. Richard Smith, testified that plaintiff's past work as a babysitter was semi-skilled medium work, and that her past work as a security officer was semi-skilled light work. (Tr. 53.) Dr. Smith testified that, despite her current limitations, in particular, difficulty "ambulating over uneven terrain," plaintiff was capable of working several existing jobs in the national economy. (Comm'r Br. 9; Tr. 56-57.) However, he noted that, in the event Anderson would become incapable of maintaining focus, or if she would be absent from work for three days a month on a continuing basis, she could not perform competitive work. (Tr. 57.)

## Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify that decision "with or without remanding ... for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004). Yet, this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, a court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

## Discussion

### A. Standards of Eligibility for Disability Benefits

To be eligible for disability benefits, a claimant must establish disability within the meaning of the Act that arose prior to the expiration of the claimant's insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c). Under the Act, "disability" is

8

defined as the "inability to engage in any substantial gainful activity[2] by reason of any medically determinable physical or mental impairment . . . . [such that the claimant] cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (internal citation and quotation marks omitted).

SSA has promulgated a five-step sequential analytical schema that an ALJ must use to determine whether a claimant is disabled. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 77-78 (2d Cir. 1999).

At step one, the ALJ determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If she is, the disability claim is denied. 20 C.F.R. §§ 404.1520(b), 416.920(b).

If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step two, where the ALJ is required to determine whether the claimant has a "severe" impairment that limits her ability to perform basic work-related activities. *Id.* § 404.1520(a)(4)(ii); *Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467). If she is not so impaired, the claim is denied.

If the claimant has a severe impairment, however, the ALJ proceeds to step three and evaluates whether the impairment meets the criteria of any of the impairments listed in the Commissioner's Appendix of Impairments. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1; 42 U.S.C. § 404.1520(a)(4)(iii). If so, the claimant

---

[2] Work is "substantial" if it involves significant physical or mental activity, 20 C.F.R. § 404.1572(a), and "gainful" if it is done for pay or for profit, whether or not profit is realized. 20 C.F.R. § 404.1572(b).

is disabled and entitled to benefits. If not, the ALJ must make an assessment of the claimant's residual functional capacity. *Id.* § 404.1520(e); *see also id.* § 404.1545.

At this point, the ALJ then proceeds to the fourth step to determine whether, despite the impairment, the claimant has the residual functional capacity to perform her past relevant work.[3] *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of proof as to the first four steps of the process for determining disability status. *See, e.g., Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that her impairment prevents her from performing her past relevant work, the burden shifts to the Commissioner at the fifth and final step. *Id.*

At the fifth step, if the claimant cannot perform her past relevant work, the ALJ determines, based on the claimant's residual functional capacity, whether there is other work that the claimant could perform. 42 U.S.C. § 404.1520(a)(4)(v). In doing so, the ALJ considers four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir. 1999) (internal quotations omitted). If the Commissioner can show that the claimant retains the capacity to perform a certain category of work, such as light work or sedentary work, and that such work is available in the national economy, the

---

[3] "Past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

claimant is not disabled. 20 C.F.R. § 404.1560(c)(2); *see Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). If not, the claimant is disabled and entitled to benefits.

### B. The Treating Physician Rule

Under what is known as "the treating physician rule," an ALJ must give "[t]he opinion of a treating physician . . . controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78–79 (*citing* 20 C.F.R. § 404.1527(c)(2)). Although a "treating physician's statement that the claimant is disabled cannot itself be determinative," the treating physician's opinion as to "*the nature and severity of [a claimant's] impairment(s)*" is determinative if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Green-Younger*, 335 F.3d at 106 (*citing* 20 C.F.R. § 404.1527(c)(2)) (emphasis in original).

In determining how much weight to give a particular treating physician's opinion, the ALJ must explicitly discuss the requisite factors. *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2));[4] *see also Schaal v. Apfel*, 134 F.3d 496, 504, 504–05 (2d Cir. 1998) (ALJ's failure to provide "good reasons" for discounting a treating physician's medical opinion constitutes legal error); *Pierre v. Astrue*, No. 09-cv-1864, 2010 WL 92921, at *10 (E.D.N.Y. 2010) ("[A]n ALJ is required by the regulations to explain the degree of weight a treating source's opinion deserves when it is found not to be controlling, and to consider specified factors in that

---

[4] This regulation has since been renumbered 20 C.F.R. § 404.1527(c)(2).

determination"). The factors determinative of the weight to be accorded to the opinion of a treating source are:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32. Moreover, the regulations further specify that the ALJ shall "always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *accord id.* § 416.927(c)(2).

Further still, due to the nonadversarial nature of the benefits hearing, the ALJ has an affirmative duty to develop a claimant's medical history for the 12 months prior to the date that the claimant filed for disability, if the evidence is not sufficient to determine whether the claimant is disabled. *Rosa*, 168 F.3d at 79; *Hillsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330 (E.D.N.Y. 2010). But, if there is no obvious gap in the administrative record and the ALJ has a complete medical history, the ALJ is not under any duty to further develop the record. *Rosa*, 168 F.3d at 79 n.5; *Wilbur v. Colvin*, No. 13-cv-110, 2014 WL 2434955, *4 (N.D.N.Y. May 30, 2014). Even if the information in the record is inconsistent, the ALJ can weigh the relevant evidence to determine whether the claimant is disabled. 20 C.F.R. § 404.1520b(a) (2012).

### C. The ALJ's Decision

In analyzing Anderson's claim, the ALJ properly followed the prescribed five-step test set forth in the Commissioner's regulations. At step one, he found that Anderson had not engaged in substantial gainful activity since the alleged onset date of her disability, August 31, 2006. (Tr. 13.) The finding demonstrated the ALJ's close scrutiny of the facts. He acknowledged that Anderson had in fact worked after her alleged onset date, but found that her work activity did not "rise to the level of substantial gainful activity." (*Id.*)

At the second step, the ALJ determined that plaintiff's ailments qualified as severe impairments, including hypertension, chronic back pain, spondylosis, and obesity. (*Id.*) In explanation, the ALJ cited the consultative examinations performed at SSA's request by Dr. Harvey and Dr. Oyewo, and also the reports from the Wellstar Cobb Clinic, Dr. Giglio, and Dr. Manlapas, all of which took place between January 2009 and May 2011. Notably, the ALJ did not reference the examination performed by Dr. Rahman, plaintiff's treating physician, in 2008. (Tr. 14-15.)

Proceeding to step three, the ALJ found that none of Anderson's claimed impairments met or equaled the severity of those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 42 U.S.C. § 404.1520(a)(4)(iii). He then found that plaintiff's residual functional capacity precluded her from engaging in her past relevant work as a babysitter (semi-skilled medium-exertion work), home attendant (semi-skilled medium exertion work), and security guard (semi-skilled light exertion work). (Tr. 16-17.) At the fifth and final step, the ALJ found that, despite her diminished residual capacity, plaintiff could still perform a number of jobs in the

national economy. (Tr. 17.) In accord with his five-step analysis, he concluded that Anderson was not disabled and was, therefore, not entitled to disability benefits. (Tr. 18.)

The ALJ's determination that Anderson did not qualify as disabled under the Act is well-supported by substantial evidence. It certainly withstands plaintiff's challenge on review, in which plaintiff primarily argues that the ALJ's finding did not provide a "detailed and reasoned rationale spelling out the reasons for the weight assigned to each report, and failed to show rational support for his finding of a capacity to perform any exertional level." (Pl. Mem. at 10.)

As plaintiff correctly lays out the law, an ALJ is required to evaluate the relevant medical opinions and explain the weight given to each. *See* 20 C.F.R. §§ 404.1527(a)(2), (c)-(e), 416.927(a)(2). There is, however, no particular formulation restricting the manner in which an ALJ must express these findings. And, here, contrary to plaintiff's contention, the ALJ did just what the law plaintiff outlined requires. The ALJ considered the admitted evidence resulting from the examinations by Dr. Harvey, Dr. Oyewo, Dr. Giglio, Dr. Manlapas, and even the post-hearing treatment submission of the Wellstar clinic. Anderson complains, nonetheless, that the ALJ did not explicitly address admitted records from Anderson's physician, Dr. Rahman. Yet, the records generated by Dr. Rahman in their totality were essentially immaterial since they did not note much less assess plaintiff's disability status and, in fact, only contained diagnoses for obesity, dyslipidemia, gastritis, and hypertension—diagnoses that were consistent with those

of the consultative physicians. Accordingly, to the extent material, the Court can infer that the ALJ considered Dr. Rahman's diagnosis because the ALJ's discussion and ultimate conclusions were consistent with Dr. Rahman's conclusions, which the plaintiff claims the ALJ did not consider. *See also Walzer v. Chater*, 93 Civ. 6240, 1995 WL 791963 at *9 (S.D.N.Y. Sept. 26, 1995) (ALJ's failure to discuss a treating physician's report was harmless error where consideration of report would not have changed outcome).

Ordinarily, of course, the ALJ has an affirmative duty to develop the record where the submissions from a treating physician are sparse or conclusory. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). However, further development of the record is unnecessary when the evidence received, including all medical opinions, is consistent and sufficient to establish a claimant's disability status. 20 C.F.R. § 404.1520b(a); *Wilbur v. Colvin*, Civ. A. 5:13-110, 2014 WL 2434955 (N.D.N.Y. May 30, 2014). In this sense, importantly, the ALJ did not disregard or contest the diagnoses and findings of either source; very much to the contrary, the administrative findings and conclusion were consistent with the treating physician findings, both of Dr. Rahman (rendered before the benefits application was filed) and of the Wellstar Clinic (rendered long after). Accordingly, plaintiff's contention that the ALJ violated the treating physician rule is quite unavailing.[5]

---

[5] Plaintiff's secondary argument, that the ALJ did not fully consider her testimony regarding various ailments, is similarly unavailing. (Pl. Mem. at 3-5.)The record clearly reflects the ALJ's consideration of plaintiff's testimony regarding her hypertension, pain medications, back pain, and ear pain, (see Tr. 13-15), and

## Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the ALJ and vacate the final order of the Commissioner is denied. The cross-motion of the Commissioner is granted. The final order of the Commissioner and the ALJ's notice of determination are affirmed.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
October 28, 2014

s/Eric N. Vitaliano
_____
ERIC N. VITALIANO
United States District Judge

---

concluded that, despite these impairments, her residual functional capacity precluded a finding that she was disabled.